UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                          :
ANNE M. RAMOS,                                            :
                                                          :
                          Plaintiff,                      :
                                                          :                22 Civ. 1719 (JPC)
            -v-                                           :
                                                          :                OPINION AND ORDER
                                                          :
PORT AUTHORITY TRANS-HUDSON                               :
CORPORATION,                                              :
                                                          :
                          Defendant.                      :
                                                          :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

In the early morning hours of March 9, 2019, Anne M. Ramos, a conductor for the Port

Authority Trans-Hudson Corporation ("PATH"), was operating a PATH train traveling from

Jersey City to Manhattan.  Shortly after entering Manhattan, she began to smell a strong odor,

which she claims emanated from T-78 Crack Sealer being used to do work at the 33rd Street station.

She alleges that her exposure to methyl methacrylate contained in that sealer caused her to suffer

injuries including respiratory disease.

Ramos brings this action against the PATH under the Federal Employers' Liability Act

("FELA"), 45 U.S.C. §§ 51 *et seq.*, alleging negligence in connection with her working conditions

on March 9, 2019.  With discovery now closed, the PATH moves for summary judgment, arguing

that Ramos has failed to come forward with expert evidence necessary to establish causation.  The

PATH further requests, in the event summary judgment is denied, that the Court confine the

testimony of Ramos's proffered expert medical witnesses to opinions they formed while treating

her.

The PATH's motion for summary judgment is denied without prejudice.  While expert evidence is not necessary for Ramos to establish that she experienced a headache, sore throat, and burning eyes in the immediate aftermath of being exposed to a strong chemical odor on March 9, 2019, she will need to offer admissible expert testimony to establish causation for other injuries arising from her alleged exposure to methyl methacrylate, including the long-term ailments that she claims in this lawsuit.  In opposing summary judgment, Ramos points to two individuals who would provide that expert causation testimony: Dr. Ilia Segal, one of her treating physicians, and Ken Bickerton, an industrial hygienist.  Any trial testimony from Dr. Segal and the other doctors identified by Ramos will be limited to Ramos's disclosures pursuant to Federal Rule of Civil Procedure 26(a)(2) and to their treatment notes.  Further, while the PATH protests the ability of Dr. Segal and Bickerton to offer expert testimony on causation, that argument is only raised in its reply brief.  The proper vehicle to attack such testimony would be a motion pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Accordingly, if the parties seek to preclude the anticipated trial testimony from any of the proffered experts, they must file *Daubert* motions by March 1, 2024.  Further, in the event the Court grants a *Daubert* motion by the PATH in whole or in part, the Court will allow it to file a renewed summary judgment motion with respect to Ramos's injuries aside from those injuries she allegedly incurred in the immediate aftermath of her alleged exposure.

## I.  Background

### A.  Facts[1]

#### 1.  The March 9, 2019 Incident

The PATH operates trains that travel various routes between New Jersey and New York City throughout the day and night.  *See* Port Authority of N.Y. & N.J., https://www.panynj.gov/path/en/index.html (last visited Feb. 12, 2024).  On Saturday, March 9, 2019, Ramos was employed by the PATH as a train conductor, operating a train that, at about 1:00 a.m., had departed the Journal Square station in Jersey City destined for Manhattan.  Dkt. 32 ("Thompson Decl."), Exh. A ("Ramos Dep. Tr.") at 42:6-14, 48:4-5; Deft. 56.1 Stmt. ¶ 2; *see also* Pl. Counter 56.1 Stmt. ¶ 50; Port Authority of N.Y. & N.J., Saturday Schedules, https://www.panynj.gov/path/en/schedules-maps/saturday-schedules.html (last visited Feb. 12, 2024).  About twenty or thirty minutes before leaving the Journal Square station, Ramos learned that another PATH employee had reported an odor at one of the stations in Manhattan.  Ramos Dep. Tr. at 43:18-44:15; Deft. Reply 56.1 Stmt. ¶ 52; *accord* Ramos Dep. Tr. at 43:18-20 ("Q. Prior to [being asked to cover the train route,] had you had any reports of a chemical or smell up by 23rd or 33rd Street?  A.  Yes.").  Upon arriving at the 23rd Street station, Ramos opened the train window and doors, at which point she was met with "a significant smell."  Ramos Dep. Tr.

---

[1] The following facts are drawn primarily from the PATH's statement of undisputed material facts pursuant to Local Civil Rule 56.1(a), Dkt. 27 ("Deft. 56.1 Stmt."), Ramos's counter-statement and supplemental statement under Rule 56.1(b), Dkt. 33 ("Pl. Counter 56.1 Stmt."), and the PATH's response to Ramos's supplemental statement, Dkt. 37 ("Deft. Reply 56.1 Stmt."). Unless otherwise noted, the Court cites only to the PATH's statement of undisputed material facts when Ramos does not dispute the fact, has not offered admissible evidence to refute it, or simply seeks to add her own "spin" on the fact or otherwise dispute the inferences drawn from it. Similarly, the Court cites only to Ramos's supplemental statement when the PATH does not dispute the fact, has not offered admissible evidence to refute it, or simply seeks to offer its own "spin" on the fact or otherwise dispute the inferences drawn from it.

at 48:4-5; *see* Deft. 56.1 Stmt. ¶ 3.  At her deposition, Ramos described the odor as "horrible.  It's burning rubber, just like chemicals burning."  Ramos Dep. Tr. at 48:8-10; *see* Deft. Reply 56.1 Stmt. ¶ 53 (admitting that Ramos "encountered an odor at PATH's 23rd Street Station").  Ramos, however, did not report the odor while at the 23rd Street station because, at that time, she "didn't think it was that bad."  Ramos Dep. Tr. at 48:17-20.

The odor had grown significantly stronger at the next station stop at 33rd Street, however.  When Ramos opened the train's window and doors at that station, she found the smell to be "unbearable" and "overpowering."  *Id.* at 48:21-22, 50:21-22; *see* Deft. 56.1 Stmt. ¶ 4.  Mario Sciancalepore, a PATH operations examiner, took a train to the 33rd Street station upon receiving a report of an odor there.  Dkt. 35 ("Brophy Supp. Decl."), Exh. R ("Sciancalepore Dep. Tr.") at 15:1-18.  When Sciancalepore arrived at the station, he "smelled something," and while he could not "specify what chemical it was," he likened the odor to the smell "if you were at a nail salon getting your nails done."  *Id.* at 15:25-16:6.  Sciancalepore, however, suggested that the odor was not as strong as Ramos reported, describing the smell as "not overwhelming," but just "a smell that you could notice."  *Id.* at 16:7-11.

Ramos's train remained at the 33rd Street station for "roughly" five to six minutes.  Dkt. 28 ("Brophy Decl."), Exh. B (Ramos deposition) at 57:13-15.  At the time, workers were using T-78 Crack Sealer to seal cracks near turnstiles at the 30th Street side of the station, on the level above the train platform.  *See id.* at 54:7-10 ("The work was being done on the 30th Street end, which is the west end, in the turnstile area up the stairs."); Brophy Decl., Exh. F ("Green Report") at 2 ("That night and into the early morning hours, workers on the floor above the PATH train-tunnel and platform were sealing cracks in . . . the floor with the product T-78 polymer crack sealer."); *see* Deft. 56.1 Stmt. ¶¶ 5, 19.  The PATH's toxicology expert, Dr. Laura C. Green,

explained in her report that T-78 Crack Sealer "consists of methyl methacrylate polymers dissolved in methyl methacrylate monomer."  Green Report at 2; *see* Deft. 56.1 Stmt. ¶ 19.  According to Dr. Green, "[m]ethyl methacrylate has an acrid, 'fruity' odor, readily detectable by smell at very small concentrations of its vapor in air."  Green Report at 2; *see* Deft. 56.1 Stmt. ¶ 21.

While at the 33rd Street station, Ramos spoke with Sciancalepore.  Ramos did not ask for medical attention because, at that time as well, she "just didn't think [she] was that bad."  Brophy Decl., Exh. B (Ramos deposition) at 57:25-58:5; Deft. 56.1 Stmt. ¶ 8.  Ramos testified that she told Sciancalepore that her throat hurt, that she had a headache, and that the smell was "burning [her] eyes, like [her] throat."  Ramos Dep. Tr. at 48:25-49:2, 56:9-11.  Sciancalepore, however, recalled Ramos only telling him, "'[t]his place stinks' or '[t]his smell is bad.'"  Sciancalepore Dep. Tr. at 26:18-24.   While at the 33rd Street station, Sciancalepore also instructed the "trainmaster . . . to turn the fans on at 19th street, see if that would help."  *Id.* at 16:16-21.  After visiting the site where the crack sealer was being applied, Sciancalepore returned to the tracks, by which point "the smell had dissipated."  *Id.* at 22:3-24:5.  According to Anthony Savino, the "trainmaster," while activating the fans may have reduced the smell at the 33rd Street station, it created "a vacuum" that "dragged the odor from 33rd Street to 23rd Street," making the odor stronger at the 23rd Street station.  Thompson Decl., Exh. D (Savino deposition) at 24:7-22.

The train then traveled the return route back to the Hoboken station.  Ramos continued to smell the odor on the journey back, although the smell lessened "a little bit" after the Christopher Street stop.  Ramos Dep. Tr. at 63:14-17; Pl. Counter 56.1 Stmt. ¶ 56.  At Hoboken, Ramos called her dispatcher about the incident.  Ramos Dep. Tr. at 69:6-70:4.  Ramos said that she did not "know what [she was] breathing in," complained that she was experiencing a headache and a sore throat, and refused to work the 2:20 a.m. departure.  *Id.* at 69:14-17.  Ramos then traveled by a PATH

train to Journal Square, where she spoke to Savino.  *Id.* at 73:6-74:19.  The content of that

conversation is somewhat in dispute.  According to Savino, Ramos told him that "there was a smell

at 33rd Street, an odor."  Brophy Supp. Decl., Exh. S (Savino deposition) at 32:2-3.  Ramos,

however, testified that she emphasized to Savino "the severity of what's going on uptown," told

him that the smell was "really bad," and said that if she had to make the trip again and smelled the

odor, she would not open the train doors.  Ramos Dep. Tr. at 73:22-74:14.  According to Ramos,

when Savino responded that she lacked the authority to opt not to open the train doors, she left

work for the day.  *Id.* at 74:15-19.

Ramos apparently was not the only one to complain about the odor that night.  A report

indicated that PATH employees, passengers, and police complained of an overwhelming odor

causing eye and throat irritation.  Sciancalepore Dep. Tr. at 30:1-7; Thompson Decl., Exh. E

(memorandum from Sciancalepore); *see* Pl. Counter 56.1 Stmt. ¶ 63.  Sciancalepore also learned

that other PATH "employees claimed that they felt they had headaches and they went home

because of the odor."  Sciancalepore Dep. Tr. at 40:11-15.

### 2.  Ramos's Post-Exposure Medical Treatment

Several hours after this incident, Ramos visited a City MD Urgent Care facility, where she

reported having a sore throat and a headache.  Brophy Decl., Exh. C at 2-6; Deft. 56.1 Stmt. ¶ 14.

The report from this visit categorized her sore throat as "mild" and her examination as "normal."

Brophy Decl., Exh. C at 2-3; Deft. 56.1 Stmt. ¶ 14.  Ramos returned to work the following week,

but was told that Friday to see the PATH's Medical Department on Monday, March 18, 2019,

which resulted in her removal from service after the doctor listened to her lungs.  Ramos Dep. Tr.

at 81:16-25, 84:3-21; Thompson Decl., Exh. F at 1-2; *see* Pl. Counter 56.1 Stmt. ¶ 68.  The PATH

doctor noted that Ramos reported "intermittent nasal and throat burning sensation, and also ha[d]

a dry cough with deep inspiration," but that Ramos said "her headache resolved a few days after

the alleged incident" through treatment with Excedrin.  Thompson Decl., Exh. F at 1.  The doctor assessed Ramos as having "upper respiratory inflammation due to chemicals, gases, fumes and vapors, not elsewhere classified" and authorized a subsequent evaluation by both a pulmonologist and an ear, nose, and throat ("ENT") specialist.  *Id.* at 2.  Ramos remained out of work until the end of July 2019, during which period she received injured-on-duty pay.  Ramos Dep. Tr. at 94:6-24.

Ramos continued to seek medical care while out of service.  On March 19, 2019—the day after her visit to the PATH doctor—Ramos saw Dr. Hetal Patel of New Jersey Pulmonary & Sleep Associates.  Thompson Decl., Exh. G at 1-6; Pl. Counter 56.1 Stmt. ¶ 72.  As reflected in Dr. Patel's notes, Ramos now reported additional symptoms of chest tightness, shortness of breath, wheezing, coughing with occasional phlegm, and limited exercise tolerance.  Thompson Decl., Exh. G at 5-6; *see* Pl. Counter 56.1 Stmt. ¶ 72.  Dr. Patel diagnosed Ramos with "[c]hest tightness," "[s]hortness of breath," "[w]heezing," and "[c]ontact with and (suspected) exposure to other hazardous, chiefly nonmedicinal chemicals."  Thompson Decl., Exh. G at 6.  He also recorded that "[t]he patient has been exposed for a significant amount of time to a toxic substance."  *Id.*  Dr. Patel ordered a chest x-ray, which was conducted the next day and showed "[n]o radiographic evidence of acute cardiopulmonary disease."  Brophy Decl., Exh. D; *see* Defts. 56.1 Stmt. ¶ 16.  About a week later, on March 27, 2019, Ramos saw Dr. Louis J. Conte, a doctor of osteopathic medicine and an ENT specialist.  Thompson Decl., Exh. H; Pl. Counter 56.1 Stmt. ¶ 73.  Dr. Conte performed a "Nasal Endoscopy/Pharnygoscopy" and diagnosed that Ramos's "nasal airway was inflamed with crusting and bleeding."  Thompson Decl., Exh. H at 5; Pl. Counter 56.1 Stmt. ¶ 73.

From April 2019 through October 2020, Ramos followed up with Dr. Patel, and also began seeing another pulmonologist, Dr. Alan Burghauser.  At a visit with Dr. Patel on April 1, 2019,

Thompson Decl., Exh. G at 7-9, Ramos continued to report "shortness of breath, chest tightness, wheezing and cough," *id.* at 7.  Dr. Patel's diagnosis remained the same as at the prior March 19 visit, but this time he additionally noted that Ramos had "airway reactivity."  *Id.* at 8.  When Ramos next saw Dr. Patel on April 19, 2019, *id.* at 9-10, Ramos reported no improvement in her symptoms since her prior visit, *id.* at 9.  Although Dr. Patel's diagnosis was again unchanged, he adjusted Ramos's treatment regimen.  *Id.* at 10.  Before her next visit with Dr. Patel, Ramos saw Dr. Burghauser, whom she would see a number of times over the course of 2019.

Ramos's first visit with Dr. Burghauser was on May 1, 2019.  Brophy Decl., Exh. I at 1-4. At that visit, she complained of chest tightness, shortness of breath, coughing, sore throat, and morning headaches.  *Id.* at 1.  Under a section of the notes titled, "PFT" (presumably indicating results from a pulmonary function test), Dr. Burghauser wrote, "airsignificant reactive airway….. – asthma. with mild airways trapping."  *Id.*  In the same section of the notes, he additionally wrote that "Pt is currently a conductor at Port Authority – exposure to various occupational irritants." *Id.*  Dr. Burghauser identified two "active problems" for Ramos: "[s]hortness of breath" and "[c]ough."  *Id.*  And, more specifically, his assessment listed three conditions: (1) "[a]cute bronchospasm"; (2) "[p]anlobular emphysema"; and (3) "[m]oderate persistent asthma, uncomplicated."  *Id.* at 3.  Dr. Burghauser further noted that these "[f]indings [were] consistent with toxic inhalation."  *Id.*

Ramos had another visit with Dr. Patel on May 10, 2019.  Thompson Decl., Exh. G at 11-14.  Dr. Patel reported that Ramos's breathing had "slightly improved" and that she was "coughing less," although she still felt "limited as compared to her baseline."  *Id.* at 11.  Dr. Patel's diagnosis of Ramos again stayed the same, though he changed her prescribed treatment.  *Id.* at 12.  Dr. Patel

also ordered a CT scan of Ramos's chest, which revealed "[n]o radiographic evidence of acute cardiopulmonary disease." *Id.* at 17; Deft. 56.1 Stmt. ¶ 17.

Ramos returned to Dr. Burghauser on June 5, 2019.  Brophy Decl., Exh. J at 1-4.  According to the notes from this visit, Ramos did not report chest tightness, wheezing, chest pain, or headaches.  *Id.* at 1-2.  In the notes for both this and Ramos's prior visit on May 1, Dr. Burghauser wrote that "BMI must be reduced!!!"  *Id.* at 3; Brophy Decl., Exh. I at 4.  Despite Ramos's apparent change in reported symptoms, Dr. Burghauser's notes listed five "[a]ctive problems," comprised of the two active problems from Ramos's May 1, 2019 visit—shortness of breath and a cough— and the three conditions listed in his assessment from that prior visit—panlobular emphysema, moderate persistent asthma (uncomplicated), and acute bronchospasm.  Brophy Decl., Exh. J at 1.

Ramos had her final visit with Dr. Patel on June 28, 2019, roughly a month before she returned to work.  Thompson Decl., Exh. G at 13-14.  At this session, she reported "a good result" from taking two medications, that "her breathing improved," and that she was able to do her activities of daily living "without distress."  *Id.* at 13.  Indeed, Dr. Patel recorded that "[t]he patient has had significant improvement" and "cleared [her] for work."  *Id.* at 14.  Dr. Patel also recommended that Ramos continue using the two effective medications for a few more months.  *Id.*

Ramos saw Dr. Burghauser again on September 11, 2019, a few months after returning to work.  Brophy Decl., Exh. J at 5-8.  Dr. Burghauser recorded improvements in Ramos's condition since starting medication and noted that her symptoms were "[r]elated to weather."  *Id.* at 5.  Dr. Burghauser added two active problems to his diagnosis: "[a]llergic rhinitis due to pollen" and "[p]ostnasal drip."  *Id.*  He similarly noted that Ramos was "somewhat better.  will re-evaluate when weather improves.  humidity."  *Id.* at 7.  And Dr. Burghauser again observed that Ramos

9

needed to reduce her BMI.  *Id.*  Based on this report and Dr. Patel's prior report, it appears that Ramos's respiratory health problems had largely subsided.

Ramos next saw Dr. Burghauser on October 19, 2020, by which time she appeared to have endured a resurgence in her coughing and trouble breathing.  Brophy Decl., Exh. K.   Dr. Burghauser's notes stated that Ramos has a "history of allergic rhinitis asthmatic bronchitis panlobular emphysema" and that while "[i]t was originally thought that these were due to multiple allergens the patient was supposed [sic] to an allergenic work [sic] the exact allergen is not known right now."  *Id.* at 1.  Dr. Burghauser also noted that he had "asked the patient to see an otolaryngologist and a [sic] allergist [sic] no abnormalities that seem to make this even generally a [sic] underlying exposure/condition.  But the patient still coughs and has episodes of shortness of breath and wheezing."  *Id.*  He recorded that "the patient's symptoms may be due to a toxic inhalation of unknown J [sic] patient still has respiratory problems, etiology of which is unknown." *Id.* at 2.

Ramos saw Dr. Burghauser again roughly six months later on April 22, 2021.  Brophy Supp. Decl., Exh. P.  According to the notes from that visit, Ramos reported having a "dry cough and chest tightness for 2 years now."  *Id.* at 1.  These symptoms aside, Dr. Burghauser noted that Ramos had "an [a]ppointment with the allergist and everything went fine."  *Id.*  His assessment notes did not mention toxic inhalation, instead listing three general conditions: moderate persistent asthma, obesity, and panlobular emphysema.  *Id.* at 2.

Finally, on September 29, 2022, more than six months after commencing this action, Ramos saw Dr. Ilia Segal, Dr. Burghauser's former partner.[2]  Thompson Decl., Exh. I.  According

---

[2] Dr. Burghauser has retired from the medical practice he shared with Dr. Segal.  *See* Ramos Dep. Tr. at 27:23-25; Pl. Counter 56.1 Stmt. ¶ 75.

to Dr. Segal's notes, Ramos reported symptoms similar to those she had reported in October 2020—"intermittent chest tightness intermittent wheezing cough productive of clear sp[u]tum"—as well as "nasal congestion."  *Id.* at 1.  Dr. Segal reviewed Dr. Burghauser's notes for Ramos, "especially done [sic] notes concerning toxic fume inhalation in March 2019."  *Id.*  Dr. Segal's notes also briefly summarized Ramos's medical history with his practice, noting that she "was diagnosed by [Dr. Burghauser] in March 2019 with consequences of inhalation of respiratory irritant.  She had a mild pulmonary function abnormality and was classified as reactive airways asked my [sic] with mild air trapping[.  H]er chest x-ray on March 20 is [sic] 2019 was negative." *Id.* at 3.  Dr. Segal concluded that "[a]fter examining [Ramos] and examining her medical records it is likely that her condition was caused/aggravated by inhalation of strong pulmonary irritant in March 2019."  *Id.*  Dr. Segal's notes further memorialized that he and Ramos "spent 40 minutes face-to-face examination and review of her past medical record past pulmonary function testing and past chest x-ray discussing and prescribing medications and making follow-up recommendations."  *Id.*

### 3.  The Parties' Proffered Expert Testimony

In moving for summary judgment, the PATH argues that Ramos has failed to present expert evidence establishing that her exposure to methyl methacrylate on March 9, 2019 caused her injuries.  Thus, the Court here briefly reviews Ramos's proposed expert testimony.

Ramos has disclosed six expert witnesses for trial: Ken Bickerton, an industrial hygienist, and five doctors: Drs. Segal, Burghauser, Conte, and Patel, who are discussed above, *see supra* I.A.2, and Dr. James G. Sanderson, who appears to be Ramos's primary care physician, *see* Deft. 56.1 Stmt. ¶ 39.  *See* Brophy Decl., Exh. G ("Pl. Rule 26(a)(2) Disclosures").  Ramos produced an expert report from Bickerton pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).  Thompson

Decl., Exh. J ("Bickerton Report").[3]  Ramos's disclosures for the five doctors, however, was pursuant to Rule 26(a)(2)(C), which permits non-retained experts to provide less fulsome disclosures than the expert report required for retained experts under Rule 26(a)(2)(B).  *See* Pl. Rule 26(a)(2) Disclosures at 2-8; *Allen v. Koenigsmann*, No. 19 Civ. 8173 (LAP), 2021 WL 1552771, at *2 (S.D.N.Y. Apr. 20, 2021) (describing disclosure rules for non-retained experts under Rule 26(a)(2)(C)).

Bickerton intends to testify at trial that the PATH failed to take reasonable precautions to protect its employees from the dangers associated with exposure to T-78 Crack Sealer, a conclusion he bases on twenty-five years of experience "in the occupational safety and health field."  Bickerton Report at 1 (executive summary).  Although Bickerton's report includes a brief review of the dangers associated with methyl methacrylate and a summary of the relevant discovery that he reviewed, *id.* at 2-3, the report focuses primarily on the scope of the PATH's obligations to provide a safe workplace and additional safety precautions it could have implemented.  *Id.* at 5-7.  Although not included in his "Conclusion," *id.* at 8-9, Bickerton also appears to offer his opinion that exposure to methyl methacrylate could cause the sort of injuries that Ramos has alleged, *see id.* at 3 ("The National Institute of Occupational Safety and Health

---

[3] Bickerton in fact provided two reports, both filed as Exhibit J to the Thompson Declaration: the first report incorrectly assumed that Ramos had been exposed to Transpo Color-Safety paint, which contains two additional chemical components on top of methyl methacrylate that are not present in the Transpo T-78 Crack Sealer, the product that had been applied at the 33rd Street station.  *See* Bickerton Report at 11.  Bickerton then provided a single page supplementary report indicating that his conclusion remained unchanged, despite his prior report being premised on a different product than the one Ramos allegedly was exposed to.  *Id.* ("Based on this new information, to a reasonable degree of professional certainty, it is still my conclusion that PATH failed to take reasonable steps to protect Ms. Ramos from harm due to exposure to hazardous chemicals in her workplace.").  Because Bickerton's ultimate conclusion is consistent across the two reports, the Court refers to a single report when discussing Bickerton's proposed testimony for simplicity.

(NIOSH) lists the health effects [of methyl methacrylate] as irritation eyes, skin, nose, throat; dermatitis.  These are the symptoms that Ms. Ramos reported").

The scope of the proposed testimony from Ramos's doctors is even less clear.  The parties seem to agree that each doctor has been "proffered" by Ramos "to give opinion testimony on causation."  Deft. 56.1 Stmt. ¶¶ 24 (Dr. Segal), 29 (Dr. Burghauser), 35 (Dr. Sanderson), 40 (Dr. Conte), 45 (Dr. Patel).  Ramos's Rule 26(a)(2) Disclosures state that each doctor "is expected to offer opinions regarding the treatment of Plaintiff, history taken, review of medical records, including any test results, findings, causation, prognosis, diagnosis, recommendations, ability to work and follow-up."  Rule 26(a)(2) Disclosures at 2, 3, 5-7.  But the disclosures do little to expound on the details of each doctor's supposed causation opinions, the bases for reaching them, or each doctor's qualifications to offer them.  The disclosures further advise that each doctor "may also testify as to the nature and extent of Plaintiff's medical condition and her prognosis for the future, including the need, if any, for future treatment and any costs associated therewith."  *Id.* at 2, 3, 5, 6, 8.  Ramos did not provide any additional expected areas of testimony for Dr. Burghauser. *Id.* at 3-4; *see also* Pl. Counter 56.1 Stmt. ¶ 75.  For the other doctors, the disclosures indicate that the witnesses will testify, in some manner, that Ramos suffers from medical ailments, including pulmonary issues, as a result of her chemical exposure on March 9, 2019:

- "Dr. Segal's opinions may include, but are not limited to, that Plaintiff's pulmonary medical condition was caused or contributed to by inhalation of a [sic] chemical fumes/odor in March 2019."  Rule 26(a)(2) Disclosures at 2.

- "Dr. Sanderson's testimony will likely include, but is not limited to, that Plaintiff's pulmonary condition was caused or contributed to by chemical exposures from work in about March 2019." *Id.* at 5.[4]

- "Dr. Conte's testimony will likely include, but is not limited to, that Plaintiff suffered headaches, nose and throat burning, chronic cough and dizziness that was caused or contributed to by chemical exposures at work in about March 2019." *Id.* at 6.

- "Dr. Patel's testimony will likely include, but is not limited to, that Plaintiff suffered chest tightness, shortness of breath, wheezing, chronic cough and other pulmonary symptoms that were caused or contributed to by chemical exposures at work in about March 2019." *Id.* at 7-8.

Ramos additionally provided the same generic disclosure regarding the sources on which each doctor would draw for their proposed testimony. Namely, each would testify based upon

> details contained in Plaintiff's treatment records, the history taken, and a review of her medical records, including tests and treatment records from any and all Plaintiff's other treating physicians. This includes but is not limited to test results; reports and notes of consultations with other physicians, pulmonologists, and other medical personnel; notes, records, and reports of attending and/or assisting physicians and medical personnel; evidence of medications taken, prescribed, refused, or otherwise not taken and the significance and consequence thereof, if any; any and all other documents, reports, notes, records, testimony, depositions, or anything else which may be introduced into evidence at the time of trial of this action as normally relied upon by medical practitioners in the treatment, diagnosis, prognosis, or to form any opinion with respect to any medical condition. . . . Finally, [each doctor] may comment on the findings, opinions, and conclusions of any medical experts identified by defendant after review of their report, deposition, test results, and/or notes provided regarding any examination of the Plaintiff.

*Id.* at 2-6, 8.

---

[4] None of Dr. Sanderson's treatment records have been provided to the Court.

The PATH has identified Dr. Green as its expert.  Dr. Green is expected to testify that "the evidence fails to indicate that Ms. Ramos experienced an unhealthful exposure to methyl methacrylate vapors during the early morning minutes" of March 9, 2019.  Green Report at 4. More specifically, Dr. Green explains in her report that "[m]ethyl methacrylate is used in various other products and settings [in addition to T-78 Polymer Crack Sealer], including as a cement for dental procedures and joint replacements; as a hardener in some formulations of nail polish; as an ingredient in the manufacturing of acrylic plastics and other polymers; and as a starting material for the production of other acrylates."  *Id.* at 2; Deft. 56.1 Stmt. ¶ 20.  Further, Dr. Green would testify that methyl methacrylate's "acrid, 'fruit' odor" is "readily detectable by smell at very small concentrations of its vapor in the air" and that the Occupational Safety and Health Administration ("OSHA") considers "the permissible exposure limit . . . to protect the health of people working with (or in the vicinity of) methyl methacrylate is some 4,000 times higher" than its odor threshold, an exposure limit that "applies to exposures averaged over an 8-hour work-day."  Green Report at 2; Deft. 56.1 Stmt. ¶ 22.  According to Dr. Green, the National Institute for Occupational Safety and Health agrees with OSHA's permissible exposure limit, "even as a time-weighted average over a 10-hour work-day, even if exposed daily, throughout their working lifetimes."  Green Report at 2; Deft. 56.1 Stmt. ¶ 22.  Thus, Dr. Green would testify that even assuming Ramos smelled methyl methacrylate, that does not establish that she was exposed to levels of the chemical sufficient to cause her injuries.  Green Report at 4.  As summarized by Dr. Green in her report:

> For several reasons, it seems unlikely that Ms. Ramos was in fact overexposed to methyl methacrylate vapors during the one hour or so at issue.  She did not work with, and had no direct contact with, the liquid product.  The product was being applied one flight above where her train was traveling.  The product cures within hours, and, once in its solid, dried state, would no longer be emitting vapors (although the work continued later on Saturday morning, apparently causing more odors throughout Saturday).  There must be quite high rates of air exchange (and

hence substantial dilution of vapors) within both the upper mezzanine level where the product was being applied and the platform level where the train traversed.

Taken together, then, the evidence fails to indicate that Ms. Ramos experienced an unhealthful exposure to methyl methacrylate vapors during the early morning minutes at issue.

*Id.* Ramos has not challenged the admissibility of Dr. Green's proposed expert testimony.

## B.   Procedural History

On March 1, 2022, Ramos filed her Complaint, bringing a single claim under FELA.  Dkt. 1 ("Compl.") ¶¶ 21-24.  She alleges that on March 9, 2019, after being "expos[ed] to the dangerous chemical odor," *id.* ¶ 11, she arrived at the Journal Square station and "had a headache, sore throat, burning in her chest, and was feeling ill," *id.* ¶ 12.  She further alleges that, as a result of that exposure, she "suffered severe and permanent injuries, including but not limited to chest tightness, shortness of breath, chronic cough, and reactive airway disease."  *Id.* ¶ 15.  She further claims to have suffered "severe and debilitating mental and emotional distress as a direct and proximate result" of the exposure and that her "injuries require ongoing medical care and treatment."  *Id.* ¶¶ 16-17.  She also claims to have "incurred medical and hospital expenses" in the past to treat her injuries and expects to continue to incur such expenses in the future.  *Id.* ¶ 18.  Similarly, she contends that she has experienced past "pain, suffering and mental anguish," which will continue in the future and be permanent.  *Id.* ¶ 19.  And finally, she claims to have lost income and will continue to do so in the future.  *Id.* ¶ 20; *accord id.* ¶ 23.  Ramos contends that the PATH is liable under FELA for these damages because its negligence regarding her working conditions on March 9, 2019 caused her injuries.  *Id.* ¶¶ 22-23.

On April 28, 2022, the PATH answered the Complaint.  Dkt. 12.  The Court held an initial pretrial conference in accordance with Rule 16 of the Federal Rules of Civil Procedure on May 26, 2022.  May 26, 2022 Minute Entry; *see* Dkt. 14.  Following that conference, the Court entered a

Case Management Plan and Scheduling Order that, *inter alia*, set a discovery schedule for the case. Dkt. 16.  The Court then granted three unopposed requests from Ramos to extend the discovery deadlines.  Dkts. 17-22.  In accordance with the revised Civil Case Management Plan and Scheduling Order reflecting the final extension, fact discovery concluded on January 2, 2023, Dkt. 22 ¶ 6(a), and expert discovery (and all discovery) concluded on February 17, 2023, *id.* ¶ 7(a). That revised Civil Case Management Plan and Scheduling Order also contained interim expert discovery deadlines: Ramos's expert disclosures pursuant to Rule 26(a)(2) were due on December 23, 2022, *id.* ¶ 7(b), and the PATH's expert disclosures pursuant to Rule 26(a)(2) were due on January 27, 2023, *id.* ¶ 7(c).

Following the close of discovery, the PATH advised the Court that it planned to move for summary judgment based on the insufficiency of Ramos's expert opinion evidence.  Dkt. 24 at 1. In accordance with the briefing schedule set by the Court, Dkt. 25 at 3, the PATH moved for summary judgment on May 31, 2023, Dkts. 26-28, 29 ("Motion").  After the Court granted Ramos a brief extension for her opposition, she opposed the motion on April 27, 2023, Dkts. 32-33, 34 ("Opposition"), and the PATH filed its reply on May 12, 2023, Dkts. 35, 36 ("Reply"), 37.

## II.  Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On a motion for summary judgment, the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.  "If the moving party meets its initial burden, the nonmoving party must then 'set forth specific facts showing that there is a genuine issue for trial' using affidavits or other evidence in the record, and cannot rely on the 'mere allegations or denials' contained in the pleadings." *Taylor v. City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at *6 (S.D.N.Y. Mar. 11, 2022) (quoting *Anderson*, 477 U.S. at 248); *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("[A] nonmoving part[y] . . .  may not rely on conclusory allegations or unsubstantiated speculation . . . [and] must offer some hard evidence showing that its version of the events is not wholly fanciful." (internal quotation marks omitted)).

In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). At the same time, however, "in considering what may reasonably be inferred from witness testimony, the court should not accord the nonmoving party the benefit of unreasonable inferences, or inferences at war with undisputed facts." *Taylor*, 2022 WL 744037, at *7 (internal quotation marks omitted).

### III.  Discussion

**A.   The Federal Employers' Liability Act**

As relevant here, FELA provides that

> [e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51.  "In FELA actions, the plaintiff must prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation."  *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 87 (2d Cir. 2006) (citing *Sinclair v. Long Island R.R. Co.*, 985 F.2d 74, 77 (2d Cir. 1993)).  But a plaintiff's burden on causation under FELA is lighter than under the common law because "FELA's language on causation . . . 'is as broad as could be framed.'"  *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 691 (2011) (quoting *Urie v. Thompson*, 337 U.S. 163, 181 (1949)).  FELA's relaxed standard of causation means that a plaintiff need not satisfy the typical common law proximate cause standard—which requires that a defendant's conduct be a "substantial factor in bringing about the harm," *Tufariello*, 458 F.3d at 87 (quoting Restatement 2d of Torts § 431(a))—but instead need only show that a defendant's negligence "played any part in causing the injury" suffered by the plaintiff.  *CSX Transp.*, 564 U.S. at 700 (alterations omitted).[5]

---

[5] Notwithstanding this relaxed causation burden, a foreseeability limitation remains incorporated into the scope of a railroad common carrier's duty under FELA: a carrier's duties "are measured by what is reasonably foreseeable under like circumstances."  *CSX Trans.*, 564 U.S. at 703 (quoting *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 118 (1963)).  "Thus, if a person has no reasonable ground to anticipate that a particular condition would or might result in a mishap and injury, then the party is not required to do anything to correct the condition."  *Id.* (internal quotation marks and alterations omitted). As a result, juries "would have no warrant to award damages in far out 'but for' scenarios," nor would "judges have . . . warrant to submit such cases to the jury."  *Id.* at 704.

The PATH argues that no reasonable jury could find that its negligence caused Ramos's injuries because those injuries supposedly arose from her exposure to an obscure chemical whose effects are beyond the ken of a lay juror, yet she has not come forward with admissible expert testimony on causation.  Motion at 1-17.  The PATH further seeks to limit the testimony of the five doctors whom Ramos disclosed as experts, *see supra* I.A.3, to opinions they formed in the course of treating Ramos.  Motion at 17-19.  Ramos responds that expert testimony is not required to establish causation in this case because it is common knowledge that her alleged injuries could result from her exposure to methyl methacrylate fumes from the T-78 Crack Sealer.  Opposition at 4-11.  Ramos further contends that she will offer expert testimony on causation at trial through Bickerton and Dr. Segal.  *Id.* at 9-10.  In reply, the PATH argues that any opinion from Dr. Segal on the cause of Ramos's medical condition is inadmissible because it lacks a methodological basis. Reply at 7-10.

## B.    Analysis

When tort claims arise from exposure to an allegedly harmful chemical, a plaintiff usually must present expert testimony on causation to survive summary judgment because the casual connection between the chemical and the allegedly resulting injury is generally outside the ken of a lay juror.  *See Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) ("[T]his court has never held that a Jones Act[6] plaintiff can survive summary judgment in a toxic tort case without admissible expert testimony on the issue of causation.").  Courts have developed a three-part framework for what expert causation evidence is typically required in such cases: there must be

---

[6] "The Jones Act incorporates FELA by reference.  Under both statutes, the plaintiff bears a reduced burden of proof with respect to causation." *Wills*, 379 F.3d at 47 n.8 (applying law developed under FELA to the plaintiff's Jones Act claim and collecting cases recognizing the standard of liability is identical under the two statutes).

expert evidence on the level of exposure of the plaintiff to the toxin in question, general causation, and specific causation. *Blume v. Port Auth. Trans-Hudson Corp.*, No. 18 Civ. 12251 (CM), 2020 WL 1674000, at *5 (S.D.N.Y. Apr. 6, 2020) (quoting *Mancuso v. Consol. Edison Co. of N.Y., Inc.*, 967 F. Supp. 1437, 1445-46 (S.D.N.Y. 1997)); *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268 (2d Cir. 2002) (holding that for plaintiffs in a toxic tort case "to establish causation, they must offer admissible expert testimony regarding both general causation . . . and specific causation"). "General causation bears on whether the type of injury at issue can be caused or exacerbated by the defendant's product. Specific causation bears on whether, in the particular instance, the injury actually was caused or exacerbated by the defendant's product." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 251 n.1 (2d Cir. 2005) (internal quotation marks omitted) (citing *Amorgianos*, 303 F.3d at 268).

This expert testimony requirement does not apply in FELA cases, however, when the causal link would be obvious to a lay juror. In particular, if there is a "generally understood causal connection between physical phenomena . . . and the alleged injury that would be obvious to laymen," then expert testimony is not required to establish causation under FELA. *Tufariello*, 458 F.3d at 88 (quotation omitted); *accord Ulfik v. Metro-N. Commuter R.R.*, 77 F.3d 54, 59-60 (2d Cir. 1996); *Romanelli v. Long Island R.R. Co.*, 898 F. Supp. 2d 626, 631 (S.D.N.Y. 2012) ("[U]nder FELA, when a causal relationship lies within the realm of common knowledge, an expert is not required to testify to it."); *Blume*, 2020 WL 1674000, at *6 (similar, citing *Tufariello*, 458 F.3d at 88). Thus, the Second Circuit has held that expert testimony is not necessary to establish "that prolonged exposure to paint fumes would cause headache, nausea, and dizziness," *Ulfik*, 77 F.3d at 59-60, or to establish "[t]he causal link . . . between hearing loss and repeated exposure to noise so loud that it causes physical pain or ear-ringing," *Tufariello*, 458 F.3d at 89.

This exception also can relax the typical requirement for expert evidence on a plaintiff's level of exposure if lay testimony can establish the necessary exposure for purposes of causation. *See Tufariello*, 458 F.3d at 89-90 (not requiring "objective measurements" of the sound levels that allegedly caused the plaintiff's hearing loss where the plaintiff and others described that the train's horns as "very, very loud," the plaintiff testified that the blasts made his ears ring, and another person testified that the sound forced him to put his hands over his ears); *see also Blume*, 2020 WL 1674000, at *2-3, 7 (not requiring expert testimony on the level of the plaintiffs' exposure where the chemical dripped onto one of the plaintiff's shoulders and skin while he was working, and he needed to have his nostrils cauterized "to repair his septum after damage sustained during a history of exposure," and the other plaintiff was exposed to the chemical "three days a week for several months . . . in a workspace where the fans were broken and where, for at least some portion of the relevant time period, the doors were kept closed obstructing ventilation").

But where the causal connection between the incident and the injury is not generally understood, causation falls outside the realm of a lay person's knowledge and expert testimony is required.  In *Wills*, for instance, the plaintiff sought damages under the Jones Act, general maritime law, and New York law, related to her husband's death from cancer complications, alleging that his illness and death were attributable to his exposure to benzene and polycyclic aromatic hydrocarbons while working aboard the defendants' vessels.  379 F.3d at 36-37.   In holding that the plaintiff was required to proffer expert testimony on causation, the Second Circuit explained that while expert testimony is not necessary when the jury can draw its own conclusions without the help of an expert, if "the nexus between the injury and the alleged cause would not be obvious to the lay juror, '[e]xpert evidence is often required to establish the causal connection between the accident and some item of physical or mental injury.'"  *Id.* at 46 (quoting *Moody v. Maine Cent.*

*R.R. Co.*, 823 F.2d 693, 695 (1st Cir. 1987) (alteration in original)).  And if "an injury has multiple potential etiologies, expert testimony is necessary to establish causation, even in view of plaintiff's reduced burden to prove causation."  *Id.*  Describing *Ulfik* as "wholly distinguishable," the Second Circuit in *Willis* explained that "the causal link between exposure to toxins and other behavior and squamous cell carcinoma is sufficiently beyond the knowledge of the lay juror that expert testimony is required to establish causation."  *Id.* (citation omitted).

With that framework in mind, Ramos's FELA claim must be divided into distinct sets of alleged injuries from a causation perspective.  First, she contends that she suffered injuries in the immediate aftermath of her exposure to a strong odor while operating the PATH train on March 9, 2019.  Compl. ¶ 12 ("Upon arrival at Journal Square station, Plaintiff reported to Defendant the severity of the odor and that she had a headache, sore throat, burning in her chest, and was feeling ill.").  And second, she alleges that she then suffered, and continues to suffer, from injuries as a consequence of her exposure to methyl methacrylate that day, and therefore seeks past and future medical expenses, lost wages, and compensation for past and future pain, suffering, and mental anguish.  *Id.* ¶¶ 18-20, 23.

Starting with the first set of alleged injuries—those alleged to have occurred in the immediate aftermath of her exposure to the chemical odor—expert testimony is not required for Ramos to be able to testify that the odor was "unbearable" and "overpowering."  Ramos Dep. Tr. at 48:22, 50:22.  Under Federal Rule of Evidence 701, a non-expert may testify in the form of an opinion that is, *inter alia*, "rationally based on the witness's perception."  Fed. R. Evid. 701(a).  Much like describing loud horn blasts that caused pain and one's ears to ring, *see Tufariello*, 458 F.3d at 90, a witness's description of a strong odor is based on that witness's perception and is admissible under Rule 701.

23

Further, a lay juror could reasonably conclude that being exposed to "overwhelming" and "unbearable" fumes from crack sealant would cause someone to suffer from the conditions that Ramos reported in the hours after her exposure: a headache, a sore throat, and burning eyes. Ramos reported these physical conditions to Sciancalepore at the 33rd Street station minutes after smelling the strong odor. Ramos Dep. Tr. at 48:25-49:2, 56:9-11 (testifying that she told Sciancalepore that her throat hurt, that she had a headache, and that the smell was "burning" her eyes and throat). When Ramos presented to the City MD Urgent Care facility several hours later, she similarly reported a headache and a "mild" sore throat, with her examination otherwise "normal." Brophy Decl., Exh. C at 2-3 ("pt states she works on the path train and started to smell a chemical odor and immediately felt a sore throat and headache"). Experiencing such symptoms after smelling an odor from a sealant that was "significant," "overpowering," "unbearable," and "horrible" and resembled "chemicals burning," Ramos Dep. Tr. at 48:5, 48:8-9, 48:22, 50:22, is analogous to the dizziness from paint fumes experienced by the plaintiff in *Ulfik*. And similar to the situation in *Ulfik*, apparently other PATH employees also complained of the odor and left work because of it. *Compare* Sciancalepore Dep. Tr. at 40:2-18 (testifying that he learned that other PATH employees "claimed that they felt they had headaches and they went home because of the odor") *with Ulfik*, 77 F.3d at 59 (explaining that the plaintiff had "presented both his own testimony and the testimony of [two colleagues], who stated that after smelling chemical fumes [in the same location as the plaintiff], they suffered from symptoms similar to [the plaintiff]'s"). In fact, a report indicated that PATH employees, passengers, and police complained that night of an overwhelming odor that caused them eye and throat irritation. Sciancalepore Dep. Tr. at 30:1-7; Thompson Decl., Exh. E. Such immediate consequences of exposure to strong, unbearable fumes resembling burning chemicals are commonly understandable by, and within the ken of, lay persons. *See Ulfik*, 77 F.3d

at 59-60 ("[T]he trier of fact could reasonably determine, without expert testimony, that prolonged exposure to paint fumes would cause headache, nausea, and dizziness." (citation omitted)).

But the medical implications of exposure to a relatively obscure chemical like methyl methacrylate—beyond the aforementioned immediate effects from exposure to strong fumes—are not within the ken of lay persons. The average lay juror likely has not heard of methyl methacrylate, let alone be in a position to conclude whether Ramos's testimony about the odor's strength meant that she was exposed to levels of that chemical that could have caused her alleged ongoing health conditions—to include a persistent difficulty breathing, chest tightness, wheezing, coughing, congestion, nasal airway inflammation, airway reactivity, panlobular emphysema, moderate persistent asthma, and acute bronchospasm. *See supra* I.A.2. Whether exposure to methyl methacrylate caused any of these conditions is not within the realm of a lay person's knowledge. Moreover, according to the PATH's expert, Dr. Green, exposure well above the odor threshold would be necessary to trigger health effects. Green Report at 2; *see* Deft. 56.1 Stmt. ¶ 22. Even one of Ramos's pulmonologists acknowledged that the cause of such conditions persisting over multiple years is far from clear: in October 2020, Dr. Burghauser noted that "the patient's symptoms may be due to a toxic inhalation of unknown J [sic] patient still has respiratory problems, *etiology of which is unknown*." Brophy Decl., Exh. K at 2 (emphasis added). When health conditions have multiple etiologies, expert testimony is necessary to establish causation. *See Wills*, 379 F.3d at 46 (holding that "where an injury has multiple potential etiologies, expert testimony is necessary to establish causation, even in view of plaintiff's reduced burden to prove causation" under the Jones Act).[7]

---

[7] Ramos's contention that inhaling fumes from crack sealant containing methyl methacrylate gave rise to her long-term ailments is clearly distinguishable from the situation in

Additionally, while as a general matter, the non-immediate effects of exposure to methyl methacrylate would not be within the province of someone lacking expertise in the area, the particular evidence presented here—including Ramos's medical history reflecting that her post-exposure symptoms improved but then worsened—amplify the need for expert causation testimony in this case.  According to the notes from Ramos's visit to Dr. Patel on June 28, 2019, just three-and-one-half months after the exposure, Ramos was able to complete daily living activities "without distress" and Dr. Patel cleared her to return to work.  Thompson Decl., Exh. G at 13-14.  This was consistent with Dr. Burghauser's notes from Ramos's visit about two-and-one-half months later on September 11, 2019, when he reported that her chief complaints had been resolved and that any lingering symptoms were "[r]elated to weather."  Brophy Decl., Exh. J at 5. It thus appears that, in the three-to-six months after the March 9, 2019 exposure, Ramos's medical impairments had largely subsided.  Yet, when she visited Dr. Burghauser again on October 19, 2020, she reported shortness of breath, coughing, and wheezing.   Brophy Decl., Exh. K at 1. Ramos continued to report similar symptoms in her subsequent visits to Dr. Burghauser on April 22, 2021, Brophy Supp. Decl., Exh. P at 1, and to Dr. Segal on September 29, 2022, Thompson Decl., Exh. I at 1.  The potential for a single exposure to methyl methacrylate, over a relatively brief period of time, to cause multi-year and possibly chronic respiratory problems—particularly

---

*Ulfik*.  The plaintiff there claimed that he became dizzy and develop a headache after smelling paint fumes.  77 F.3d at 56, 59-60.  Dizziness from inhaling paint fumes is a consequence within the understanding of a lay person, much like Ramos's immediate experience of a sore throat, a headache, and eye irritation for which the Court has concluded that expert testimony is not needed. The dizziness experienced by the plaintiff in *Ulfik* continued over the next several days, and later caused him to fall down stairs and injure his leg.  *Id.* at 56.  Falling is a consequence of dizziness that likewise is readily comprehendible by a lay juror.  But here, Ramos contends that her exposure to crack sealant—and in particular, a specific chemical, methyl methacrylate—caused her to suffer from ongoing chest tightness, shortness of breath, coughing, and other ailments for at least three-and-a-half years after her exposure.  Whether her brief exposure to methyl methacrylate could have resulted in such conditions is certainly beyond the knowledge of a lay person.

problems that improved but then exacerbated—is hardly the type of common physical phenomenon that falls within the ken of lay jurors.

The question then becomes whether Ramos has come forward with expert testimony to establish causation as to her injuries beyond the headache, sore throat, and burning eyes that she experienced in the immediate aftermath of smelling a strong chemical odor on March 9, 2019. While Ramos initially argues—incorrectly, as discussed above—that no expert testimony on causation is required for these injuries, she maintains that she has nonetheless "presented expert evidence" in the form of anticipated testimony from Bickerton and Dr. Segal.  Opposition at 9-10.

Starting with Bickerton, Ramos contends in opposing summary judgment that he "will discuss the hazards of methyl methacrylate and the precautions that PATH should have undertaken on the night of the incident."  *Id.*  The hazards of methyl methacrylate could potentially be relevant for general causation.  And, as noted above, Bickerton's report briefly suggests his view that exposure to methyl methacrylate could lead to Ramos's supposed injuries: "The National Institute of Occupational Safety (NIOSH) lists the health effects as irritation eyes, skin, nose, throat; dermatitis.  These are the symptoms that Ms. Ramos reported."  Bickerton Report at 3.  Bickerton does not present expert conclusions on specific causation or the level of Ramos's exposure to methyl methacrylate, let alone whether Ramos's exposure level could have triggered her alleged injuries.  Nor does he clearly offer any opinion on whether exposure to methyl methacrylate could lead to lasting medical conditions.[8]  His report also lacks mention of applicable literature on the

---

[8] The product Safety Data Sheet ("SDS") for T-78 Crack Sealer states that "[n]o chronic (long-term) effects are known for humans" as a result of exposure to the product.  Thompson Decl., Exh. K at 1.  Regulatory health standards such as those in SDSs are not generally a basis for establishing general causation, *see, e.g.*, *Mancuso*, 967 F. Supp. at 1448 ("[R]ecommended or prescribed precautionary standards cannot provide legal causation . . . . Failure to meet regulatory standards is simply not sufficient to establish general causation.").  This is because such standards

long-term health effects of exposure to methyl methacrylate.  *See Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 882 (10th Cir. 2005) (stating that epidemiology "is the best evidence of general causation in toxic tort cases").  Thus, at most Bickerton has been disclosed to opine on general causation, and it is not readily apparent to the Court the scope, if any, of an opinion on that issue that Bickerton would be qualified to offer.

Ramos seems to rely on Dr. Segal to establish specific causation and, possibly, her level of exposure.  As noted, Ramos's Rule 26(a)(2) disclosure states that Dr. Segal will testify about, *inter alia*, "causation," explaining that his "opinions may include, but are not limited to, that Plaintiff's pulmonary medical condition was caused or contributed to by inhalation of a [sic] chemical fumes/odor in March 2019."  Rule 26(a)(2) Disclosures at 2; *see* Deft. 56.1 Stmt. ¶ 45 (agreeing that Dr. Segal has been "proffered" by Ramos "to give opinion testimony on causation").  Dr. Segal's notes from Ramos's visit on September 29, 2022 also recorded, as an assessment: "After examining [Ramos] and examining her medical records it is likely that her condition was caused/aggravated by inhalation of strong pulmonary irritant in March 2019."  Thompson Decl., Exh. I at 3.  And in opposing summary judgment, Ramos asserts that Dr. Segal will testify that her "condition was caused/aggravated by inhalation of strong pulmonary irritant in March 2019." Opposition at 9.

The PATH challenges the scope of Dr. Segal's testimony in both its moving brief and in its reply.  In its moving brief, the PATH seeks to limit the testimony of Dr. Segal—as well as Ramos's four other putative medical experts—to opinions formed in the course of treating Ramos.

---

are often *more protective* than the liability regime imposed by tort law.  *See id.*  Thus, the fact that the SDS suggests that merely smelling methyl methacrylate is not enough to cause long-term conditions undermines any inference from Bickerton's report, which relies on the SDS, to establish causation for Ramos's alleged injuries.  *See* Bickerton Report at 11 (noting reliance on the T-78 SDS in reaching his conclusions).

Motion at 17-19.  As noted, the disclosures for these treating doctors, as they are not retained by Ramos, was pursuant to the relaxed requirements of Federal Rule of Civil Procedure 26(a)(2)(C). Under Rule 26(a)(2)(C), the disclosure "must state: (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, and 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify."  Fed. R. Civ. P. 26(a)(2)(C).

The PATH argues that Ramos's disclosures for her five doctors did not comply with Rule 26(a)(2)(C) because they "provide no notice of what, exactly, these witnesses relied upon or will rely upon in formulating their opinions in this matter, provide no specific factual information as to what any and all other documents, reports, notes, records, testimony, depositions, or anything else, and deprive Defendant of any notice so that an adequate cross-examination can be prepared."  *Id.* at 18 (internal quotation marks removed).  As a remedy, the PATH argues that "these treating medical providers should be limited to the facts and opinions they made, as memorialized in their treating notes, while treating Plaintiff and should not be permitted to testify about any undisclosed facts or opinions."  *Id.* at 18-19; *cf.* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").  Ramos has not opposed the PATH's argument that the testimony of her five proffered doctor experts be limited in this manner, instead arguing only that Dr. Segal (and Bickerton) would offer expert testimony on causation.  *See generally* Opposition.[9]

---

[9] The Second Circuit has identified four factors for determining whether a district court abuses its discretion in imposing a sanction under Rule 37.  *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006).  While that is not necessarily the posture here, as Ramos has not even argued that she seeks to offer expert testimony for these witnesses beyond what is

By failing to even mention the PATH's requested restriction, let alone opposing it, Ramos has waived any opposition. *See, e.g.*, *Triodetic Inc. Statue of Liberty IV, LLC*, 582 F. App'x 39, 40 (2d Cir. 2014) (where the plaintiff never raised certain arguments in opposing summary judgment, those arguments were waived); *Murtha v. N.Y. State Gaming Comm'n*, No. 17 Civ. 10040 (PHM), 2022 WL 784756, at *7 n.7 (S.D.N.Y. Mar. 15, 2022) (by not objecting to the defendants' request in their motion for summary judgment that the court decline to exercise supplemental jurisdiction over his state law claims, the plaintiff waived any such objection). Accordingly, the trial testimony of Drs. Segal, Burghauser, Sanderson, Conte, and Patel will be confined to opinions memorialized in their notes in the course of treating Ramos, and they may not testify to any undisclosed facts or opinions.

The PATH additionally argues, in its reply brief, that Dr. Segal's opinion on causation is inadmissible because the Rule 26(a)(2) disclosure as to him and his "treatment note do not demonstrate any methodological basis for his conclusory statement that Plaintiff's exposure caused her symptoms and none of her other conditions did so." Reply at 9. The proper avenue for the PATH to seek preclusion of the proffered expert testimony of Dr. Segal—as well as the proffered expert testimony of Bickerton and Drs. Burghauser, Sanderson, Conte, and Patel, to the extent Ramos still seeks to offer any expert opinions from these doctors[10]—is through a motion to

---

memorialized in their treating notes, Ramos has not contended that any of those factors weigh in her favor.

[10] Although Ramos's expert disclosures for Drs. Burghauser, Sanderson, Conte, and Patel also stated that each would testify on causation, Pl. Rule 26(a)(2) Disclosures at 3 (Dr. Burghauser), 5 (Dr. Sanderson), 6 (Dr. Conte), 7-8 (Dr. Patel); *accord* Deft. 56.1 Stmt. ¶¶ 29 (Dr. Burghauser), 35 (Dr. Sanderson), 40 (Dr. Conte), 45 (Dr. Patel), Ramos has not contended in opposing summary judgment that she seeks to have any of these individuals opine on causation, *see* Opposition at 9-10. It therefore appears that Ramos has abandoned an argument for any doctor other than Dr. Segal to provide expert evidence on causation. *Anti-Monopoly, Inc., v. Hasbro, Inc.*, 958 F. Supp. 895, 907 n. 11 (S.D.N.Y. 1997) ("[T]he failure to provide argument on a point

preclude or limit their testimony pursuant to Federal Rule of Evidence 702 and *Daubert*, either as a stand-alone motion or as part of a summary judgment motion.  While the PATH argues in its reply brief that Dr. Segal's opinions are unreliable and therefore inadmissible, thus appearing to invoke *Daubert*, *see* Reply at 7-10, Ramos has not had the opportunity to respond to this argument. *See Lozada v. TaskUs, Inc.*, No. 22 Civ. 1479 (JPC), 2024 WL 68571, at *12 (S.D.N.Y. Jan. 5, 2024) (declining to reach an argument raised for the first time in a footnote of the defendants' reply brief); *Snyder v. Graham*, No. 09 Civ. 10307 (RJS), 2012 WL 983536, at *5 (S.D.N.Y. Mar. 22, 2012) ("The Court need not consider a new argument raised for the first time in a reply brief, as arguments presented in this fashion deny the opposing party a fair opportunity to respond." (quotations omitted)).  Rather than resolving whether any or all of Dr. Segal's causation testimony should be precluded without affording Ramos the opportunity to respond, the Court will allow the parties to file *Daubert* motions.

The Court therefore denies the PATH's motion for summary judgment without prejudice. As discussed, summary judgment is denied with respect to injuries alleged suffered in the immediate aftermath of Ramos's exposure to a strong chemical odor on March 9, 2019, *i.e.*, a headache, a sore throat, and burning eyes, because expert testimony is not necessary to establish causation for those injuries.  Expert testimony is necessary, however, to establish causation for Ramos's other claimed injuries.  The Court will permit the parties to file *Daubert* motions challenging each other's proffered experts.  In the event the Court grants any *Daubert* motion by the PATH in whole or in part concerning the issue of causation, the Court will permit the PATH

---

at issue constitutes abandonment of the issue."), *aff'd*, 130 F.3d 1101 (2d Cir. 1997); *Jamie H. Bassel DC PC v. Aetna Health Ins. Co. of New York*, No. 20 Civ. 9019 (JMF), 2022 WL 910640, at *1 (S.D.N.Y. Jan. 6, 2022) (same).

to file a renewed summary judgment motion with respect to injuries aside from those incurred in the immediate aftermath of her exposure.

## IV.  Conclusion

Accordingly, the PATH's motion for summary judgment is denied without prejudice, and the parties may file motions to preclude expert testimony pursuant to *Daubert*.  Such motions shall be filed by March 1, 2024, oppositions are due March 15, 2024, and replies are due March 22, 2024.  In the event the Court grants in whole or in party any *Daubert* motion filed by the PATH, the Court will permit the PATH to file a renewed motion for summary judgment.  The Clerk of the Court is respectfully directed to close the motion at Docket Number 26.

SO ORDERED.

Dated: February 13, 2024
       New York, New York

JOHN P. CRONAN
United States District Judge